IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

VICTORIA DIVISION

| | | |
|---|---|---|
| ALFRED QUINTANILLA, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-12-044 |
| | § | |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMIN., | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Before the Court, with the consent of the parties, are competing Motions for Summary

Judgment filed by Plaintiff Alfred Quintanilla (Dkt. No. 23) and Defendant Carolyn W. Colvin,

the Acting Commissioner of the Social Security Administration (Dkt. No. 24). The Motions

pertain to Quintanilla's appeal of the denial of his application for Social Security Benefits. Having

considered the motions and responsive briefing, the administrative record[1] and applicable law, the

Court concludes, for the reasons discussed herein, that Quintanilla's Motion is **DENIED**, that the

Commissioner's Motion is **GRANTED**, and that the Commissioner's decision is **AFFIRMED**.

---

[1] The administrative record, which exceeds 800 pages, was filed electronically. (Dkt. No. 17).

## I. INTRODUCTION

Alfred Quintanilla ("Quintanilla") filed an application with the Social Security Administration ("SSA") on May 9, 2009, seeking disability benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI. Quintanilla alleges that his disability began on April 25, 2009, due to leukemia, diabetes mellitus, bone and joint aches and weakness and fatigue. (Transcript ("Tr.") 190-199, 217).

After being denied benefits initially and on reconsideration, Quintanilla requested, and was granted, a hearing before an Administrative Law Judge ("ALJ") to review the denial. The ALJ, Bernard J. McKay, held the hearing on September 16, 2010. (Tr. 30-67, 126-171). During the hearing, the ALJ heard testimony from Quintanilla, who was represented by counsel, and from an impartial vocational expert ("VE"), Jeffrey T. Kiel. On November 17, 2010, the ALJ issued a decision that was unfavorable to Quintanilla. (Tr. 10-19).

Quintanilla's attorney requested review by the Appeals Council of the SSA's Office of Hearings and Appeals and submitted additional documents for consideration, but his request was denied on June 14, 2012. (Tr. 1-5, 6-8). Accordingly, the decision of the ALJ became the final decision of the Commissioner and it is from this final decision that the appeal has been taken pursuant to 42 U.S.C. § 405(g).

## II. THE COMPETING MOTIONS

In his motion, Quintanilla argues that the ALJ's decision is not supported by substantial evidence and that the ALJ failed to adhere to the proper legal standards when evaluating the evidence as it pertains to his residual functional capacity. In particular, Quintanilla contends that (1) the ALJ's failed to consider all his impairments when making the RFC finding; and (2) the ALJ

2

failed to properly evaluate the opinion of his treating physician. He also maintains that, having only the ability to do sedentary work, the ALJ's errors were not harmless because he was considered an individual who was closely approaching advanced age and, as such, the Medical-Vocational Rules would have directed the ALJ make a finding that he was disabled. The Commissioner, in contrast, contends in her motion that there is substantial evidence in the record to support the ALJ's decision, that the decision comports with applicable law, that any deficiency in the ALJ's written decision constitutes harmless error, and that the decision should be affirmed. (Tr. 24).

## III. STANDARDS AND BURDENS

### A. Summary Judgment Standard

The Court analyzes Motions under the well-established summary judgment standard. Fed. R. Civ. P. 56(c); *see generally*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999); *United States v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992).

### B. Judicial Review of Administrative Decisions

A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case

3

for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g) (2000). Substantial evidence is defined as being more than a scintilla and less than a preponderance and of such relevance that a reasonable mind would accept it as adequate to support a conclusion. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Brown*, 192 F.3d at 496; *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

## B. Burden of Proof

A claimant bears the burden of proving he suffers from a disability under the Social Security Act. *Anthony*, 954 F.2d at 293. The mere presence of an impairment does not necessarily establish a disability. *Id.* A claimant is only disabled within the meaning of the Social Security Act if he has a medically determinable physical or mental impairment lasting at least 12 months that prevents him from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). To determine whether an individual is disabled, the Commissioner utilizes the five-step sequential evaluation process set forth in the regulations. *See Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can

4

perform other work. *Id*; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Rivers v. Schweiker*, 684 F.2d 1144, 1152-1153 (5th Cir. 1982). If, at any step in the process, the Commissioner determines that the claimant is disabled, the evaluation ends. *Leggett*, 67 F.3d at 564; *Barajas v. Heckler*, 738 F.2d 641, 643 (5th Cir. 1984).

## IV. DISCUSSION

### A. The Administrative Record

The central dispute in this action is the assessment of Quintanilla's residual functional capacity. In particular, the ALJ determined that he had the residual functional capacity to perform a full range of light work as defined in the regulations.[2] (Tr. 17). When determining whether the Commissioner's decision is supported by substantial evidence, the court considers several factors which include: (a) the objective medical facts; (b) the diagnoses and opinions from treating and examining physicians; (c) the claimant's subjective evidence of pain and disability; and (d) the claimant's age, educational background, and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). The Court, therefore, begins its discussion by summarizing this evidence.

### 1. Age, Education and Work History

---

[2] Under the regulations, "light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567; 416.967.

On May 5, 2009, Quintanilla applied for benefits due to leukemia, diabetes mellitus, bone and joint aches and weakness and fatigue. (Tr. 190-199, 217). On the date of his alleged onset, April 25, 2009, Quintanilla was nearly fifty years old. (Tr. 213). He attended high school through 10th grade (Tr. 129-130) and his past work history included working in a plastics plant (2008-2009), as a warehouseman (2007-2008), in an automotive repair shop (2004-2007), and ast a feed store manager (1987-1997; 1997-2000). (Tr. 130, 133-140, 168-169, 218).

### 2. Objective Medical Evidence, Diagnosis and Opinions

The medical records in this case date back to 2008. These early records (*i.e.*, December 2008 and January 2009) relate to the care Quintanilla received for his diabetes. (Tr. 397-401, 402, 404-407). Despite having been diagnosed with diabetes years before, the records reflect that Quintanilla had not taken medication to control his diabetes since 2004. Dr. McFarland, who was Quintanilla's family practice doctor, ordered tests and determined that Quintanilla had elevated glucose levels. Dr. McFarland diagnosed Quintanilla with uncontrolled diabetes, prescribed him with medication, instructed him to monitor his blood sugar levels and to return for a follow-up visit. (Tr. 397-401, 402, 404-407).

The records reflect that approximately three months later (*i.e.*, April 25, 2009), Quintanilla presented at the emergency room ("ER") at Memorial Medical Center due to the development of an abscess on his groin that was accompanied by fever. (Tr. 221, 296-319). Based on the records, Quintanilla denied experiencing any specific muscle or joint pain, stiffness or gout; he had no swelling, warmth, pain or redness over the joints; no limitations of activities reported; and no weakness or muscle cramps. (Tr. 523). Quintanilla underwent a physical examination and he was found to have a full range of motion in his neck without pain, shoulder shrug and range of

6

motion without weakness, and a full range of motion without tenderness in his joints and extremities. (Tr. 524-525). Consistent with the finding from the physical examination, a whole body scan revealed only minor degenerative changes of the sacroiliac joints, minor degenerative changes of the shoulder and knee joints, and no evidence of abnormal uptake in the axial or appendicular skeletons to suggest a fracture or metastatic disease. (Tr. 420). Nonetheless, Quintanilla was hospitalized because additional testing (*i.e.*, blood work, a biopsy and a bone scan) revealed that Quintanilla had type II diabetes and chronic lymphocytic leukemia ("CLL"). (Tr. 221, 296-303, 418-424). The doctors determined that the type of leukemia that Quintanilla had "usually progress very slowly and have a significantly better clinical outcome than ZAP-70-positive cases." (Tr. 411). After Quintanilla's conditions (*i.e.*, the diabetes and the CLL) were stabilized, he was discharged from the hospital on May 4, 2009. (Tr. 307-308, 325).

Shortly after his discharge from the hospital, Quintanilla saw Dr. Ahmad Qadri, M.D., P.A. on May 13, 2009 (Tr. 429-430) and then visits to Dr. McFarland followed on May 14 and May 20, 2009. (Tr. 392-394). The notes from these visits reflect Quintanilla's report that his energy level was poor and that he was experiencing weakness and "severe fatigue." (Tr. 394, 429-430). Quintanilla was examined and the notes reflect that he had a full range of motion with no bone or muscle tenderness. Additionally, Dr. Qadri advised Quintanilla that no intervention was needed at that time, but routine follow-up visits were recommended. (Tr. 429-430).

While continuing to treat Quintanilla's diabetic condition (Tr. 704-705, 714-716), Dr. McFarland referred him to M.D. Anderson for further evaluation and/or treatment of his leukemia. (Tr. 748). On September 14, 2009, Quintanilla first met with Dr. Wierda, a specialist at M.D. Anderson, and, a month later he returned for a follow-up visit. (Tr. 725-728, 729-730).

7

During his initial visit, Quintanilla reported that he experienced fatigue that he rated as an "8/10" in terms of severity. (Tr. 729). A physical examination was performed and Dr. Wierda noted his findings as follows:

> [t]he patient is a well-developed, well-nourished gentleman awake, alert and oriented x3 in no acute distress. HEENT: PERRL [pupils equally round and reactive to light], EOMI [extraocular movements intact]. Sclerae anicteric. Oral mucosa is moist, pink without lesions. Neck is supple without JVD. LUNGS: Clear to auscultation and percussion bilaterally. Cardiovascular exam was regular rate and rhythm, S1, S2. No. S3. Abdomen was soft, nontender, nondistended with normoactive bowel sounds. EXTREMITIES: Without clubbing, cyanosis or edema. He has bilateral axillary nodes measuring 1 x 1 cm and bilateral inguinal nodes measuring 1 x 2 cm. I do not appreciate any hepatosplenomegaly.

(Tr. 729, 810-812). Dr. Wierda ordered additional testing which included blood work and a bone marrow test. (Tr. 729, 802, 810-812). Based on his exam and the results of the tests, Dr. Wierda diagnosed Quintanilla as a patient with "relatively recently diagnosed previously untreated chronic lymphocytic leukemia" ("CLL"), however, he noted that Quintanilla had "a stable white blood cell count." (Tr. 729). Dr. Wierda also expressed his opinion that there was no indication for immediate treatment and, unless otherwise indicated, only annual follow-up visits were necessary. (Tr. 726, 729). Although Dr. Wierda acknowledged that Quintanilla "does have symptoms of fatigue which is prominent," he commented that "this may be related to his diabetes more than his CLL" and advised Quintanilla to follow-up with "his primary care physician for a check of a hemoglobin A1c and [recommended that there be] tighter glycemic control and monitoring." (Tr. 726, 729-730).

The records reflect that Quintanilla next saw Dr. McFarland in or around mid-2010, for follow-up care. (Tr. 736). During the visit, Dr. McFarland advised Quintanilla to monitor and record his blood sugar levels (Tr. 736) and, for further evaluation of his leukemia, Dr. McFarland

8

referred Quintanilla back to Dr. Qadri or M.D. Anderson. (Tr.736-737).

Quintanilla returned to M.D. Anderson to see Dr. Wierda on June 30, 2010. (Tr. 722-724). According to the notes, Quintanilla's chief complaint was that his bones ached in his upper and lower extremities, however, he clarified that he had not experienced any fever, only mild night sweats, no respiratory symptoms, no gastrointestinal symptoms, no genitourinary symptoms, no headaches or focal neurologic symptoms and no "significant illnesses or problems since his last clinic visit." (Tr. 722). Quintanilla underwent a physical examination which yielded no significant findings and his pain level on examination was noted to be "zero." (Tr. 722). Additional tests were performed which revealed that Quintanilla's "serum electrolytes and liver function tests [were] all within normal limits" and that his "[q]uantitative immunoglobulins [were] within normal limits." (Tr. 722). Based on the examination and the results of the lab tests, Dr. Wierda documented his assessment as follows:

> [I] had an extensive discussion [with Quintanilla] about indications for treatment, risks and benefits of treatment, and that it is unclear to [me] that [Quintanilla's] symptoms currently are significant enough to warrant treatment. Clearly, [Quintanilla] does not have indications for treatment based on his lymphocyte. Doubling time his hemoglobin or his platelet count. At this point, [Quintanilla] expresses that he would like to wait. He will follow up with his primary care provider regarding his bony pains and [I] will see him in followup in three months. We will, therefore, not initiate therapy at this time and we will continue with monitoring observation.

(Tr. 722).

Within days of seeing Dr. Wierda, Quintanilla saw Dr. McFarland on July 2, 2010, regarding his "bones ache." (Tr. 734-735). A physical examination was performed, however, no significant findings were noted. (Tr. 735). Nonetheless, due to his continued complaints of pain in his bones, Dr. McFarland ordered a bone density test, as well as additional blood work.

9

(Tr. 734).[3] The bone density study revealed "an average bone mineral density." (Tr. 767-768, 797-798). However, the radiologist recommended additional testing be performed because his impression from the testing reflected "[o]verall osteopenia involving the lumbar spine and neck of both femora"[4] with "severe osteopenic readings over the L1 vertebral body." (Tr. 767).

When Quintanilla returned to see Dr. McFarland on July 16, 2010, to discuss the results of the bone density study, the notes reflect that Quintanilla reported that he was doing "ok." (Tr. 773-774, 780-781). The notes also contain a statement attributed to Quintanilla – in particular, that he was "convinced that blood sugar in 200s [was] okay." (Tr. 773). Dr. McFarland's notes reflect that he prescribed new medication to treat Quintanilla's hypertension and that he ordered addition testing – in the form of CT scans – of Quintanilla's spine. (Tr. 773; 761-766, 782-788). The cervical CT scan, which was performed a short time later, revealed "no definite marrow changes," "no definite evidence of focal disk herniation," and "[m]ild to moderate degenerative changes of the cervical spine." (Tr. 761). The thoracic CT scan revealed no acute fracture or subluxation, no significant disk disease or canal stenosis and only "mild degenerative changes involving the cervical spine." (Tr. 763-764). Finally, the lumbar CT scan revealed "diffuse asymmetrical bulging of the anulus with possible mild narrowing of the proximal left neural foramen at L4-L5" and "Grade 1 anterolisthesis with bilateral spondylolysis and possible right-

---

[3] As will be discussed below, Dr. McFarland also completed a Medical Source Statement on this date. (Tr. 731-733).

[4] Osteopenia refers to bone mineral density that is lower than normal, however, it is not low enough to be considered osteoporosis. Instead, it is merely indicative of early signs of bone loss that can turn into osteoporosis. Osteopenia normally has no symptoms, such as pain, however, the risk of breaking a bone increases as the bone becomes less dense. http://www.webmd.com/osteoporosis/tc/osteopenia-overview.

sided foraminal stenosis."[5]  (Tr. 765-766).  Quintanilla met with Dr. McFarland after the CT scans were performed and, while the notes reflect that Quintanilla continued to report that his "bones ache," Dr. McFarland's notes are devoid of any remarkable findings upon physical examination.  (Tr. 771-772, 778-779).

On August 17, 2010, Quintanilla saw Dr. McFarland for routine lab work.  (Tr. 769-770, 776-777).  During his visit, Quintanilla complained that he had a knot on his left leg, that he experienced fatigue and that his "bones are hurting."  (Tr. 769).  Quintanilla also reported that, with medication, his blood sugars were ranging between 130-160.  (Tr. 769).  According to the notes, a physical examination was performed, but no significant findings were noted in the records.  (Tr. 770).

On March 1, 2011, Quintanilla saw Dr. Qadri.  (Tr. 823-824).  During the visit, Quintanilla complained that he had a poor energy level and that he felt weak.  (Tr. 823-824).  Dr. Qadri performed a physical examination, however, aside from the existence of an enlarged lymph node in the groin area, his notes from the exam reflect nothing remarkable.  (Tr. 823).  Dr. Qadri's diagnosed Quintanilla with CLL and a small lymphocytic lymphoma and he advised Quintanilla to return in six months for a follow-up visit.  (Tr. 823).

Quintanilla saw Dr. Qadri on June 21, 2011, and complained of an enlarged lymph node. (Tr. 825).  Dr. Qadri performed a physical examination, but the notes reflect no remarkable

---

[5]Anterolisthesis is when the vertebrae of the lumbar spine are not positioned correctly and the vertebrae above slips forward on the one below. The amount of slippage is graded from 1 to 4, with grade 1 being a mild slippage of about 20 percent and grade 4 being 100 percent slippage. *See* http://www.cedars-sinai.edu/Patients/Health-Conditions/Anterolistesis.aspx.

findings and his impression of Quintanilla's condition remained unchanged from his prior visit. Nonetheless, Dr. Qadri ordered chest and abdomen CT scans, but the scans showed no evidence of abnormalities. (Tr. 820-822, 825). When Quintanilla returned to see Dr. Qadri approximately two weeks later, the notes reflect that Quintanilla reported that he "feels fine." (Tr. 826-827). A physical examination was performed and no changes were found in comparison to his prior visit. (Tr. 827). Dr. Qadri instructed Quintanilla to return for a follow-up visit, with labs, in three months. (Tr. 828).

### 3. Subjective Evidence

Quintanilla was present and testified before the ALJ at the hearing held on September 16, 2010. (Tr. 32-71). During the hearing, Quintanilla stated that he continues to see his family practice doctor, Dr. McFarland, for the treatment of his diabetes. He explained that he takes prescription medication to control his diabetes. (Tr. 48, 60-63). Quintanilla testified that he experienced fatigue when his blood sugar level went down and that he was on a new medication that had been very effective in controlling his diabetes. (Tr. 60-63). He also explained that he takes prescription medication to control his hypertension and that he takes some other medication for the "soft tissue" or arthritis pain that he experiences in his lower back. (Tr. 49). In terms of his CLL (leukemia), Quintanilla clarified that he has not yet started chemotherapy and there are no definite plans to do so until his lab results are reviewed. (Tr. 56).

In terms of his daily activities, Quintanilla testified that due to the pain and fatigue, he tends to sleep a lot – taking three or four naps a day. (Tr. 45-46, 51-52, 59). Quintanilla stated that when he wasn't hurting really bad, he would help his fiancé around the house and with the shopping. (Tr. 51-52). He testified that his fiancé drove most of the time, but he explained that

he drove "every time [he] gets the chance," which he clarified was "[m]aybe like five, six times" a week. (Tr. 54). Quintanilla explained that he spent some time during the day watching television – albeit not a significant amount of time because he doesn't have cable – and that he also spent time sitting outside getting some sun. (Tr. 52). Finally, he testified that he was able to attend to his own grooming, but that his fiancé assisted him when he experienced swelling in the lymph nodes in his groin area. (Tr. 53).

### B. Residual Functional Capacity

Residual functional capacity ("RFC") is a "term of art [that] merely designates the ability to work despite physical or mental impairments." *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983); *see also*, *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (recognizing that RFC is an assessment of an individual's ability to do sustained-related physical and mental activities in a work setting on a regular and continuing basis). The ALJ has "the sole responsibility for determining a claimant's disability status,"[6] which includes the determination of the claimant's RFC. *See* 20 C.F.R. §§ 404.1546, 416.946; *see also*, *Ripley*, 67 F.3d at 557. *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir.1985). The ALJ reaches this determination through a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988); *see also*, 20 C.F.R. §§ 404.1545, 416.945 (explaining that an ALJ must consider objective medical facts, diagnoses, medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others). In so doing, the ALJ is

---

[6] *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

entitled to consider credibility. *See Greenspan*, 38 F.3d at 237 (recognizing that the ALJ is entitled to consider the credibility of the examining physicians and medical experts and to weigh their opinions accordingly); *Foster v. Astrue*, 277 Fed.Appx. 462 (5th Cir. 2008) (recognizing that the ALJ is entitled to consider the credibility of the claimant in terms of statements made concerning the intensity, persistence or limiting effects of his symptoms).

### 1.  Consideration of Quintanilla's Fatigue and Bone Aches/Pain

Quintanilla insists that the ALJ's determination is flawed because the ALJ failed to consider all of his impairments and the limiting effects resulting from his conditions when determining his RFC. (Dkt. No. 23 at 4, 7). In particular, he contends that while the "record is replete with [his] complaints of bone pain throughout his body and fatigue," the ALJ ignored this evidence and failed to explain his reasons for rejecting his subjective complaints. (Dkt. No.24 at 4).

As a preliminary matter, Quintanilla's claim that the ALJ ignored this evidence simply has no merit. A review of the administrative decision clearly reflects that the ALJ considered the entire record when determining Quintanilla's RFC. (Tr. 17). Moreover, the ALJ's decision reflects that he expressly acknowledged that the record contained evidence of Quintanilla's repeated complaints to medical providers that he experienced fatigue and aches and pain in his joints and bones. (Tr. 17). While the ALJ may not have discussed each and every medical finding and opinion in the record, "procedural perfection in administrative proceedings is not required." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Nor is there evidence that, even if the ALJ had discussed each and every finding and opinion, the result would be altered. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); *see also, Dollins v. Astrue*, 2009 WL 152466, at *5 (N.D. Tex. June 2, 2009) (despite evidence that would have supported the opposite conclusion, the ALJ's

14

decision is not subject to reversal because substantial evidence also supports the conclusion that was reached by the ALJ.); *see generally, Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988) (an ALJ is not required to incorporate limitations in his RFC that he did not find to be supported in the record).

Quintanilla next argues that the ALJ failed to explain his reasons for rejecting his subjective complaints. This argument also lacks merit. The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir. 1981)); *see also, Ripley*, 67 F.3d at 556 (once a medical impairment is established, the ALJ must consider the claimant's subjective complaints of pain along with the medical evidence in determining the individual's work capacity); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) ("[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings"). A review of the administrative decision in this case reflects that the ALJ did so. (Tr. 17). While expressly recognizing Quintanilla's subjective complaints of fatigue and body aches,[7] the ALJ found that they were not entirely credible because they were inconsistent with the objective medical evidence[8] and his activities of daily living. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir.2003) (an ALJ may discount subjective complaints of pain

---

[7] *See Foster v. Astrue*, 277 Fed.Appx. 462 (5th Cir. 2008) (an ALJ is entitled to consider the credibility of the claimant in terms of statements made concerning the intensity, persistence or limiting effects of his symptoms; *see also, Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (recognizing that an ALJ's credibility finding on a claimant's subjective complaints is entitled to considerable deference).

[8] Quintanilla's treating physicians described his athralgias/myalgias as mild. (Tr. 17).

15

as inconsistent with other evidence in the record). In fact, as noted by the ALJ, Quintanilla's treating physicians described his athralgias/myalgias as mild. (Tr. 17).

Not dissuaded, Quintanilla argues that the ALJ's credibility determination is flawed because he failed to consider all the objective medical evidence in reaching this conclusion. In particular, Quintanilla argues that the results of the CT scan of his spine adds credence to his subjective complaints of unremitting fatigue and body aches. A review of the administrative decision reflects that the ALJ considered Quintanilla's subjective complaints in light of the objective medical evidence, which included the findings from the CT scan of his spine. The CT scan of Quintanilla's cervical spine revealed no evidence of herniations and only mild to moderate degenerative changes in Quintanilla's cervical spine. (Tr. 761). While the CT scan of his lumbar spine revealed Grade 1 or mild anterolisthesis with bilateral spondylolysis and "possible" right-sided foraminal stenosis at L5-S1 and disc bulging at L4-L5. (Tr. 761-767, 780-781), the repeated physical examinations by his treating doctors revealed no remarkable findings and, in fact, his treating specialist noted that his pain level upon physical examination was "zero." (Tr. 429-430, 729, 810-812, 722, 770, 772, 823, 827). The ALJ also found that Quintanilla's acknowledged activities were not consistent with the severity of symptoms he claimed. (Tr. 17). For example, the ALJ noted that Quintanilla reported that he drives 5 to 6 times a week, he helps with the household chores, he goes grocery shopping three times a month, he spends time outside, he attends church on Sundays and he is able to care for his own hygiene and grooming. (Tr. 17). Insofar as the ALJ's determination regarding Quintanilla's credibility is supported by substantial evidence in the record, it will not be disturbed by this Court. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n. 2 (5th Cir. 1994); *see also*, *Falco*, 27

16

F.3d at164 n. 19 (the Fifth Circuit recognizes that "the ALJ is best positioned" to make credibility determinations because of the opportunity to observe the claimant first-hand).

### 2. Consideration of the Treating Physician's Opinions

Quintanilla next argues the ALJ's RCF determination is not supported by substantial evidence because the ALJ failed to properly analyze and weigh the opinions of Dr. McFarland, his treating, family/general practice medical doctor. The administrative record contains two opinions expressed by Dr. McFarland – namely, the twice uttered opinion that Quintanilla was unable to work; and the opinion that Quintanilla's exertional limitations restricted him to a limited range of sedentary work. (Tr. 579, 587; 731-733).

Initially, with regard to the first opinion, the ALJ acknowledged that Dr. McFarland expressed the opinion that Quintanilla was unable to work in August 2009 and, again, in April 2010. (Tr. 17, 747, 748). While it is evident from the decision that the ALJ considered Dr. McFarland's opinion concerning his ability to work, the ALJ is not required to give any special significance to the opinion, nor is he required to justify his decision because this determination is expressly reserved for the Commissioner. 28 U.S.C. §404.1527(e); *see also, Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (recognizing that an ALJ is not required to give any special significance to opinions about the claimant's ability to work because this determination is reserved for the Commissioner); *Martinez*, 64 F.3d at 176 (whether a claimant is "disabled" is a decision solely reserved for the ALJ); *Miller v. Barhart*, 211 F. Appx 303, 305 (5th Cir. 2005) (distinguishing between the weight given to a treating physician's medical opinion on the nature and severity of an impairment and his opinion on whether the patient is disabled and cannot work). Thus, even to the extent urged, this argument is unpersuasive.

17

The Court turns to Dr. McFarland's second opinion. In July 2010, Dr. McFarland opined that Quintanilla was limited to performing a limited range of sedentary work.[9] A review of the decision reflects that the ALJ carefully considered, but that he did not give controlling weight to Dr. McFarland's opinion that Quintanilla was only capable of performing sedentary work. Ordinarily, the opinions of treating physicians are given considerable weight in determining disability. *Myers*, 238 F.3d at 621. This is especially true when the treatment period has been over a considerable period of time. *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). However, less weight can be given if good cause is shown. Good cause includes conclusory statements from the treating physician, opinions otherwise unsupported by the evidence, or conclusions unsupported by medically accepted clinical techniques. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000); *Scott*, 770 F.2d at 485; *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

In the present case, after carefully and properly considering all of the evidence in the record, the ALJ concluded that the record did not support the limitations expressed by Dr. McFarland in his opinion. (Tr. 17). *See Greenspan*, 38 F.3d at 237 (recognizing that the ALJ has broad discretion to determine medical expert's credibility and to weigh their opinions and that

---

[9] In a Medical Source Statement form that Dr. McFarland completed in July 2010, he opined that Quintanilla was limited by the following: occasionally lifting 10 pounds; frequently lifting less than 10 pounds; standing or walking at least 2 hours in an 8-hour workday; that he must be allowed to alternate sitting and standing to relieve pain or discomfort due to hip pain; limited ability to push and/or pull in both his upper and lower extremities because "due to leukemia" he has "almost no strength." (Tr. 731-732). Dr. McFarland also opined that due to his leukemia, Quintanilla was "very weak" and in "a lot of pain" so his postural limitations included never climbing or crawling and only occasionally balancing, kneeling, crouching and stooping. (Tr. 732). Dr. McFarland opined that Quintanilla had limited ability to reach in all directions; limited ability to perform handling (gross manipulations); unlimited ability to perform fine manipulations and feeling; and environmental limitations due to his impairments which included limited ability to handle temperature extremes, hazards and fumes, odors, chemicals or gases. (Tr. 733).

he is not required to adopt opinions in a report that he finds are inconsistent with the medical and other objective evidence of record); *see also, Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990) (explaining that the ALJ has the responsibility to resolve conflicts in medical opinions). Having reviewed the record, the Court concludes that substantial evidence exists in the record that supports the ALJ's finding. While the diagnostic tests (*i.e.*, x-rays and CT scans) did reveal degenerative changes in Quintanilla's cervical spine, the changes were described to be mild to moderate. (Tr. 761, 763-764). The diagnostic tests also revealed that Quintanilla's lumbar spine showed diffuse bulging with "*possible* mild narrowing of the proximal left neural foramen at L4-L5" and "grade 1 anterolisthesis" (*i.e.*, "mild slippage") (Tr. 765-766), however, the medical records reflect that his physical examinations were largely devoid of remarkable findings. (Tr. 429-430, 523-525, 722, 729, 735, 772, 810-812, 825, 827). Moreover, when examined by Dr. Wierda in June 2010, the records reflect that Quintanilla's pain level on examination was "zero." (Tr. 722). The evidence also reflects that Dr. Wierda – the specialist at M.D. Anderson who evaluated and monitored Quintanilla's leukemia – recommended in 2009, and then again in 2010, that no treatment was currently warranted for his condition. *See generally, Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994) (recognizing that "[t]he opinion of a specialist generally is accorded greater weight than that of a non-specialist."). Although Dr. Wierda acknowledged Quintanilla's subjective complaints of fatigue and bone ache/pain in 2009, he opined that this was not due to the leukemia, but was, instead, the result of Quintanilla's diabetic condition which he felt required tighter controls by Quintanilla's treating family practice doctor. The evidence before the ALJ, which actually comes from Quintanilla himself, reflected that by working with Dr. McFarland he has since gained control of his diabetes with medication. Nor were the limitations expressed by

19

Dr. McFarland consistent with Quintanilla's acknowledged daily activities. (Tr. 233, 236-237).

Nevertheless, Quintanilla contends the ALJ erred because he failed to consider Dr. McFarland's opinion in accordance with the Fifth Circuit's decision in *Newton*.[10] As required by the regulations, when a treating physician's opinion is not given controlling weight, an ALJ is required to consider several different factors which include: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; and (5) the specialization of the treating physician. 20 C.F.R. §§ 404.1527(c); 416.927(c). Although the ALJ may not have clearly delineated his discussion of these factors,[11] it is evident to the Court that he considered each of these factors when deciding not to give controlling weight to Dr. McFarland's opinion. (Tr. 17). For example, having review the decision it is clear that the ALJ acknowledged that Dr. McFarland, who the ALJ described as Quintanilla's "family practice physician," had an ongoing relationship with Quintanilla. (Tr. 17). It is equally apparent from the ALJ's discussion that he found the medical evidence in the record did not support the limitations contained in Dr. McFarland's statement. (Tr. 17, 731-733). The ALJ explained that Dr. McFaland's opinion that Quintanilla "is limited to sedentary work" is not supported by the records which reflected that his physical examinations were "unremarkable" and that his diabetes, for which Dr. McFarland was principally treating him, was controlled with medication. (Tr. 17, 429-430, 722, 729, 770, 772, 810-812, 823, 827). The ALJ also addressed the lack of consistency of Dr. McFarland's opinion

---

[10] *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000).

[11] Notably, the ALJ expressly stated hat he considered the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927.

with the record as a whole. In particular, the ALJ noted that Quintanilla's "leukemia was asymmptomatic and has not required treatment" by his treating physicians. (Tr. 17). Although the ALJ expressly acknowledged that Quintanilla alleged symptoms that included fatigue, he noted that the leukemia specialist considered this to be secondary to his diabetes and that, according to Quintanilla himself, his diabetes was now controlled with medication. (Tr. 17). *See Fraga v. Bowen*, 810 F.2d 1296, 1305 n. 11 (5th Cir. 1987). The Court cannot, therefore, conclude that the ALJ erred in this regard.

Finally, Quintanilla argues that it was error for the ALJ to rely on the opinion of the non-examining, non-treating State agency physician[12] in reaching the determination that he was capable of performing a full range of light work. This argument lacks merit. *See* 20 C.F.R. § 404.1527(f)(2) (the opinion of a non-examining physician can serve as substantial evidence in support of ALJ's determination). Nor is the Court persuaded by Quintanilla's argument that the State agency physician's opinion could not be relied upon by the ALJ because it was rendered without a review of the complete medical record because, as discussed, he points to no subsequent evidence that would suggest that this was detrimental. Concluding that the ALJ used the proper legal standards to evaluate the evidence and that the decision is supported by substantial evidence, the Court concludes that remand is not warranted.

---

[12] Dr. Lawrence Ligon, M.D. completed a Physical Residual Functional Capacity Assessment on June 30, 2009. (Tr. 706-713). Based on his review of the records and his findings were consistent with the ability to perform light work. (*Id.*).

21

## CONCLUSION

Considering the record as a whole, the Court concludes that proper legal standards were adhered to and the Commissioner's decision is supported by substantial evidence. Accordingly, it is the **ORDER** of this Court that the Plaintiff's Motion for Summary Judgment (Dkt. No. 23) is **DENIED**, that the Defendant's Motion for Summary Judgment (Dkt. No. 24) is **GRANTED**, and that this action is **DISMISSED**.

**DONE** at Galveston, Texas, this _____22ᵈ_____ day of September, 2015.

 

_____
JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE

22